UNITED STATES of America

v.

George Robert ROSS.

Cr. No. 20878.

United States District Court
E. D. Pennsylvania.

Jan. 12, 1962.

Drew J. T. O'Keefe, U. S. Atty., for plaintiff.

Charles P. Mirarchi, Jr., Philadelphia, Pa., for defendant.

VAN DUSEN, District Judge.

This case is before the court on defendant's Motion For New Trial after a guilty verdict by the jury on these three Counts:

A. Count I charged him with conspiring, in violation of 18 U.S.C.A. § 371, with a 15-year old juvenile (Rivers) and

others to Grand Jury unknown to violate 18 U.S.C.A. §§ 472 and 473 by transferring to Rivers counterfeited $20.00 notes with intent that they be passed as true and genuine;

B.   Count III charged him with possessing a counterfeit $20.00 note with intent to defraud, in violation of 18 U.S.C.A. § 472; and

C.   Count IV charged him with transferring to Rivers a counterfeited $20.00 note with intent that it be passed as true and genuine, in violation of 18 U.S.C.A. § 473.

The testimony disclosed that Rivers had attempted to pass a counterfeit $20.00 note in an Allentown drugstore in September 1961.   Rivers testified that he had met the defendant through defendant's younger brother, who went to school with Rivers in Canada where both Rivers and defendant lived (N.T. 19).   On a Saturday afternoon, about ten days before he passed the above-mentioned $20.00 note (N.T. 37–38), the defendant had given Rivers two $20.00 notes to make purchases of items costing less than $5.00 with the understanding that Rivers would give Ross the change (N.T. 20–24).   Subsequently, Rivers came to the Allentown Fair, since Ross mentioned that there was a Fair there (N.T. 25), and met Ross there (N.T. 27).   Ross gave him the counterfeit bill and told him to "pass the bill" in the drugstore (N.T. 27).   Rivers testified that Ross knew the bill was counterfeit (N.T. 27) and that he had a roll of $20.00 notes which was four inches in diameter with him (N.T. 34).   Rivers testified that he had previously given inconsistent statements concerning his transactions with defendant because he had been threatened by him on many occasions (N.T. 50–53).   Another Canadian named Chaine, who was employed at the Allentown Fair, testified that he saw defendant at the Fair with a roll of bills (N.T. 57 ff.).   One night Chaine asked the defendant where he got the money and the defendant replied that it was none of his business (N.T. 58).   Later that evening, he saw defendant hit Rivers in the washroom of a Bethlehem bar and when he told defendant to stop, the defendant said: "Look, it is counterfeit money and nothing to fool around with.   That is my business so you mind your own."   (N.T. 59).   Chaine also testified that defendant told Rivers "if he did not keep his mouth shut, he was liable to get his throat cut" (N.T. 59).[1]

Defendant testified that he never gave Rivers any $20.00 bill in Allentown.

A.   Contention that verdict was against the evidence and against the weight of the evidence (Pars. 1 & 2 of Motion For New Trial)

■   The above summary of portions of the testimony, including Chaine's testimony that defendant admitted to him at the approximate time of giving Rivers the $20.00 note to pass in the drugstore that "it is counterfeit money and nothing to fool around with" (N.T. 59), furnishes ample support for the verdict of the jury.   In view of Chaine's testimony, the jury did not have to rely on the testimony of Rivers to prove defendant's knowledge "as to the counterfeit nature of the bill in question" (see page 2 of defendant's brief, being Document No. 9).   A review of the notes of testimony establishes that the verdict is neither contrary to the evidence nor to the weight of the evidence.   See Fowler v. United States, 242 F.2d 860, 861–862 (5th Cir. 1957).

---

1.   At the same time, Chaine testified that defendant used this language, indicating his guilty knowledge of the counterfeit nature of the $20.00 note (Exhibit G-A) (N. T. 62):

"So, he said to Rivers, 'It is a good thing you are solid.'   In other words, wouldn't talk, 'Or else we would be up the river.'   In other words, be in jail."

Rivers also testified as follows (N. T. 31):

"The day before I was apprehended I was in a bar in Bethlehem and Mr. Ross called me into the bathroom which I went in, and he slapped me in the mouth and he told me—he had told me that that was his racket and not to go talking about it or anything like that."

The Government does not rely on testimony as to declarations of a co-conspirator out of defendant's presence, as Rivers only testified to defendant's statements. The Government's reliance is on Rivers' direct testimony that Ross gave him the note, established by other testimony to be counterfeit, and told him to pass it in the drugstore. Also, Chaine gave testimony connecting defendant with the conspiracy.

■ The trial judge charged the jury that Rivers' testimony had to be scrutinized with caution and care before it should be accepted by them, both because he had been found a delinquent on a charge of burglary in Canada [2] and because he was an accomplice or co-conspirator in this same indictment under which defendant was charged (N.T. 138–9). This part of the charge concluded with this sentence (N.T. 139):

> "You should not convict a defendant upon the unsupported testimony of an accomplice, unless you believe the unsupported testimony beyond all reasonable doubt."

As stated in United States v. Migliorino, 238 F.2d 7 (3rd Cir. 1956), at page 10:

> "It is no longer open to doubt that a jury may convict on the testimony of an accomplice alone. (citing cases)."

B. Contention that statement of David M. Joliat dated December 6, 1961 (attached to Document No. 9),[3] contains after discovered evidence justifying a new trial

■ For the reasons and based on the authorities appearing at pages 1 and 2 of the Government's brief, which has been placed in the Clerk's file as Document No. 10, a new trial may not be granted on this ground. As pointed out in that brief, even if this evidence did impeach a Government witness (Chaine), it would not be a proper ground for a new trial. Furthermore, an examination of the record shows that even if Joliat testified in accordance with the statement, his testimony would not be inconsistent with that of Chaine. Chaine testified that the leader of the band which played at the Allentown Fair in September 1961 and the man by whom the band was known, as far as he knew, was Joe Cleroux,[4] the drummer (N.T. 103 & 110), that he did not know who secured the bookings for that band (N.T. 108), and that the band could have formerly been known by the name "The Disks" (N.T. 110). The statement says that for four months in 1958 defendant acted as the managing agent for a band called "The Disks." There is no contradiction between the statement of Joliat and Chaine's testimony and not even any showing that the band known as "The Disks" in 1958 was the same as the band which played at the Allentown Fair in September 1961.

C. Alleged possible prejudice in service by juror No. 7 (see Par. 3b of Motion For New Trial, being Document No. 3)

■ After the jury had returned its verdict and been discharged for the day by the trial judge, juror No. 7 approached the bench and asked the trial judge if she could be excused for the three remaining days of the period for which she had been called for jury duty, since her husband had been in an automobile accident (N.T. 165–166). Subsequently, counsel for defendant suggested that this juror might have been upset by her husband's condition and not been able to exercise her best judgment, and the trial judge agreed to write the juror in order

---

2. See United States v. Margolis, 138 F.2d 1002 (3rd Cir. 1943); Henderson v. United States, 202 F.2d 400 (6th Cir. 1953).

3. At the argument on the Motion For New Trial, counsel for defendant stated that he would try to have this statement re-executed under oath before a Vice Consul of the United States and file such sworn statement with the Clerk. In deciding this Motion, it has been assumed that the statement has been sworn to under oath in this matter.

4. Chaine had known Joe Cleroux for five years (N. T. 103).

to secure more information on the subject of his injury. Exhibit C–1 (letter dated November 29, 1961) is the copy of the letter written by the trial judge to juror No. 7 at the request of counsel for defendant, on which the juror placed her answers and which she mailed back to the trial judge together with Exhibit C–2 (letter dated December 3, 1961 from juror No. 7 to the trial judge). Counsel were given an opportunity to suggest any changes or additions to this letter prior to its being sent.

Exhibits C–1 and C–2 disclose that the accident in which the juror's husband was involved occurred at 3:45 P.M. on Monday, November 27, 1961, and that she first learned of this accident at 6:45 P.M. on that date. The juror's letter of December 3, 1961, contains this paragraph (see Exhibit C–2):

> "Since my husband was not seriously injured in the accident, we both agreed Monday evening that I should continue to serve until the completion of the case. However, it was essential that I be home when he was discharged from the hospital. Therefore, I did not wish to become involved in another case. I was advised to make the request of you after we were dismissed from the case on which I was a member of the jury."

Since counsel for defendant continued, at the argument on January 3, to rely on juror No. 7's application to be excused for the days following the trial because of her husband's accident, the trial judge, out of an abundance of caution, requested the juror to come in to chambers for questioning on January 5, 1962 (see Exhibit C–3). During this questioning, Juror No. 7 emphasized that her husband's accident had "positively" not affected her deliberations as a juror in this case in any way. Under the above circumstances, it is clear that the service by juror No. 7 as a member of the jury is not a proper ground for a new trial.

The facts that the jury considered their verdict from 10:46 A.M. (N.T. 157a) until 2:55 P.M. (N.T. 158) and from 3:09 P.M. until 3:46 P.M. (N.T. 164) and that they found the defendant not guilty on Count II (apparently in view of his testimony that he had brought Canadian money only into this country—cf. N.T. 93) show the careful consideration given by the jury to their verdict.

An order denying the Motion For New Trial (Document No. 3) will be entered at the time of sentencing of the defendant.